**ORIGINAL**

1  Eric B. Fastiff (CA State Bar No. 182260)
   (efastiff@lchb.com)
2  David T. Rudolph (CA State Bar No. 233457)
   (drudolph@lchb.com)
3  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
   275 Battery Street, 29th Floor
4  San Francisco, CA 94111-3339
   Telephone: (415) 956-1000
5  Facsimile: (415) 956-1008

6  *Attorneys for Plaintiff CopyTele, Inc.*

7

**FILED**

JAN 28 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11  COPYTELE, INC., a Delaware
    Corporation,

12                                          Civil Action No.:    **C 13    0380**
               Plaintiff,
13                                          **COMPLAINT FOR DAMAGES**
    v.
14                                          (1)   Attempted Monopolization
    AU OPTRONICS CORPORATION, a             (2)   Conspiracy to Monopolize
15  Taiwanese corporation; AU OPTRONICS     (3)   Breach of Contract
    CORPORATION AMERICA, a California       (4)   Breach of the Implied Covenant of
16  corporation; E INK HOLDINGS, INC., a          Good Faith and Fair Dealing
    Taiwanese corporation; and E INK        (5)   Fraudulent Inducement
17  CORPORATION, a Delaware corporation,    (6)   Unjust Enrichment
                                            (7)   Unfair Business Practices
18               Defendants.                (8)   Accounting
                                            (9)   Aiding and Abetting Fraudulent
19                                                Inducement
                                            (10)  Civil Conspiracy
20                                          (11)  Contract Reformation
                                            (12)  Negligent Misrepresentation
21                                          (13)  Declaratory Judgment

22                                          **JURY TRIAL DEMANDED**

23

24

25              **PUBLIC REDACTED VERSION**

26

27

28

- 1 -                              COMPLAINT FOR DAMAGES

1      Plaintiff CopyTele, Inc. (hereafter "Plaintiff" or "CopyTele") brings this action for

2  damages and injunctive relief under federal antitrust law and California law against defendants

3  (hereafter jointly referred to as "Defendants") AU Optronics Corporation ("AUOC") and AU

4  Optronics Corporation America ("AUOCA") (jointly hereafter referred to as "AUO"), and E Ink

5  Holdings, Inc. ("E Ink Holdings") and E Ink Corporation ("E Ink Corp.") (jointly referred to as

6  "E Ink"), demands trial by jury, and complains and alleges as follows:

7                          **INTRODUCTION**

8    1.    This case arises from AUO's breach of contract and fraud, and E Ink's aiding,

9  abetting, and conspiracy to effectuate AUO's fraud, all in connection with the attempted

10  misappropriation of extremely valuable patented technologies developed and owned by

11  CopyTele.

12    2.    In May of 2011, AUO fraudulently induced CopyTele to enter into two licensing

13  agreements by purporting to agree to jointly develop two groups of products incorporating

14  CopyTele's patented display technologies. The first group of products was to be based upon

15  CopyTele's patented electrophoretic display technologies (the "EPD Technologies" and as jointly

16  developed, the "EPD Products"). The second group of products was to be based upon

17  CopyTele's patented nano field emission display technologies (the "nFED Technologies" and as

18  jointly developed, the "nFED Products"). However, as quickly became apparent, AUO never had

19  any intention of jointly developing the EPD Products or the nFED Products, and instead used the

20  agreements to fraudulently obtain and transfer licenses to CopyTele's patented technologies.

21    3.    On May 27, 2011, CopyTele and AUO entered into an agreement pertaining to the

22  EPD Products (the "EPD Agreement"), and also entered into an agreement pertaining to the

23  nFED Products (the "nFED Agreement") (the EPD Agreement and nFED Agreement are jointly

24  referred to as "the Agreements"). Both Agreements required the parties to use their "best efforts"

25  in connection with the joint development of the EPD Products and the nFED Products,

26  respectively, and also included licenses to CopyTele's patented EPD Technologies, and

27  CopyTele's patented nFED Technologies, respectively, to be used in connection with the joint

28  development of the respective products. Both Agreements called for *de minimis* up-front initial

           COMPLAINT FOR DAMAGES

1    payments from AUO to CopyTele, significant milestone payments in connection with the joint

2    development of the products, and considerable ongoing royalties to be paid by AUO to CopyTele

3    from sales of the EPD Products and the nFED Products. Due to AUO's significant financial

4    resources, and based upon assurances from AUO to CopyTele that AUO would abate any

5    infringement of CopyTele's electrophoretic patents, AUO sought and received the exclusive right

6    to enforce CopyTele's valuable electrophoretic patents as part of the EPD Agreement.

7       4.      As specified by numerous emails between high ranking officials of AUO and

8    CopyTele, and confirmed by recorded minutes of several meetings between the parties, a primary

9    goal of the EPD Agreement was for CopyTele and AUO to jointly develop EPD Products that

10    would successfully compete with electrophoretic displays manufactured by E Ink, and used in

11    eReader products sold under brand names such as "Kindle" and "Nook."

12       5.      After seven months of development work on the nFED Products by CopyTele,

13    AUO was required to manufacture substrates that were needed to further develop and test the

14    nFED Products. Instead of using its "best efforts" to manufacture the substrates as required by

15    the nFED Agreement, AUO did nothing for a period of four months. Finally, in April of 2012,

16    AUO informed CopyTele that AUO had unilaterally cancelled all funding in connection with the

17    joint development of the nFED Products, effective immediately. This budget cancellation

18    constituted a material breach of the nFED Agreement by AUO.

19       6.      After over 15 months of stalling and actively blocking any material progress of the

20    joint development of the EPD Products, as more fully described below, in August of 2012, AUO

21    announced that it was selling its electrophoretic display business and subsidiary SiPix Imaging,

22    Inc. ("SiPix") to E Ink for $50 million.

23       7.      As was widely reported by the media, the primary, if not the sole purpose, of the

24    SiPix acquisition was for E Ink to attempt to monopolize the electrophoretic display market by

25    aggregating all electrophoretic technology patents. Shortly after the announced sale of SiPix to E

26    Ink, and after receiving written notice from CopyTele of CopyTele's intent to terminate the EPD

27    Agreement due to AUO's repeated failures to adhere to its "best efforts" obligations to jointly

28    develop the EPD Products, with no notice to CopyTele, AUO surreptitiously purported to

         COMPLAINT FOR DAMAGES

1  sublicense CopyTele's patented EPD Technologies to E Ink, again breaching AUO's obligations
2  to CopyTele.

3       8.     CopyTele alleges that AUO never intended to jointly develop the nFED Products
4  or the EPD Products, and that AUO's true intention was to misappropriate CopyTele's valuable
5  EPD Technologies and nFED Technologies. As a result, AUO's licenses to CopyTele's
6  technologies were fraudulently obtained.

7       9.     To make matters worse, CopyTele also alleges that AUO and E Ink conspired to
8  steal CopyTele's patented technologies, and to financially damage CopyTele such that (i)
9  CopyTele would be unable to enforce its rights under the EPD Agreement and the nFED
10 Agreement, and (ii) CopyTele would be unable to develop products with other parties that could
11 compete with products sold by AUO and E Ink.

12      10.     Significant evidence—including direct statements by senior AUO officials to the
13 effect that AUO intended to "screw" CopyTele in reprisal for alleged unfair treatment of AUO by
14 large American companies such as Apple—demonstrates that AUO never intended to jointly
15 develop products with CopyTele, and instead fraudulently induced CopyTele into licensing
16 CopyTele's patents for significantly less than their market value. Had the joint development
17 programs proceeded as anticipated, CopyTele would have earned significant royalties from the
18 sale of jointly developed products. Instead, AUO obtained enforcement and sublicensing rights to
19 CopyTele's valuable patents, for an initial *de minimis* upfront payment representing only a
20 fraction of the actual value of the licenses.

21      11.     E Ink's motive to obtain licenses to CopyTele's electrophoretic display patents is
22 clear: E Ink's electrophoretic display products—which comprise the vast majority of E Ink's
23 product offerings—infringe CopyTele's electrophoretic display patents, which cover various
24 foundational aspects of electrophoretic display technology. In fact, Barrett Comisky, one of the
25 co-founders of E Ink, purchased one of CopyTele's electrophoretic devices in December of 1999.
26 At a subsequent trade show, an E Ink employee acknowledged to CopyTele employees that E Ink
27 had reverse-engineered CopyTele's device, and also stated that E Ink expected CopyTele to
28 eventually pursue patent infringement claims against E Ink.

- 4 -

1    12.    In summary, CopyTele entered into the EPD Agreement based upon the

2    understanding that: (i) CopyTele and AUO would jointly develop EPD Products based upon

3    CopyTele's EPD Technologies; (ii) the EPD Products would compete with electrophoretic

4    displays sold by E Ink and used in eReader devices such as the "Nook" and the "Kindle;" and (iii)

5    AUO would enforce CopyTele's electrophoretic patents against all infringers, including E Ink.

6    Instead, AUO made essentially no attempt to jointly develop the EPD Products with CopyTele

7    thereby breaching its "best efforts" obligations. Moreover, rather than enforce CopyTele's

8    electrophoretic patents against infringers such as E Ink, AUO sold its electrophoretic display

9    business, SiPix, to E Ink for $50 million, and secretly sublicensed CopyTele's patents to E Ink

10   with CopyTele receiving no consideration.

11   13.    With respect to the nFED Agreement: (i) AUO did not comply with its "best

12   efforts" obligations to jointly develop products with CopyTele; (ii) AUO unilaterally cancelled

13   the entire nFED joint development budget with no advance notice or consultation with CopyTele,

14   causing significant financial hardship to CopyTele and resulting in a material breach of the nFED

15   Agreement; and (iii) AUO again attempted to misappropriate CopyTele's valuable, patented

16   technologies by retaining a license to the nFED Technologies, notwithstanding AUO's material

17   breaches of the nFED Agreement.

18   **JURISDICTION AND VENUE**

19   14.    This Court has subject matter jurisdiction over CopyTele's federal antitrust claims

20   pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15, section 16 of the Clayton Act, 15 U.S.C.

21   § 26, 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1337 (proceeding regulating

22   commerce).

23   15.    This Court has subject matter jurisdiction over CopyTele's state law claims under

24   28 U.S.C. § 1367 (supplemental jurisdiction) because the state law claims are so related to the

25   federal claims that they form part of the same case or controversy that would ordinarily be tried in

26   one judicial proceeding. The exercise of supplemental jurisdiction avoids unnecessary

27   duplication and multiplicity of actions and is in the interests of judicial economy, convenience,

28   and fairness.

- 5 -                                    COMPLAINT FOR DAMAGES

16.     This Court has personal jurisdiction over Defendants. On information and belief, Defendants do business in the State of California and in the Northern District of California, and are selling and offering to sell, and have within a reasonable period prior to the filing of this action, sold, and offered to sell their products to customers in this State and in this District, either directly or indirectly. Additionally, or in the alternative, AUO and E Ink have placed their products into the stream of commerce, knowing or reasonably expecting that such products will be used, sold or offered to be sold in this State and in this District. Defendants have intentionally established distribution channels to offer their products for sale and to sell their products in this State and in this District.

17.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. §§ 1391(b)-(c) because both E Ink and AUO reside in this District within the meaning of 28 U.S.C. § 1391(c). Additionally, Venue is proper in the Northern District of California pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22.

**PARTIES**

18.     Plaintiff CopyTele, Inc. is a Delaware corporation having its principal place of business at 900 Walt Whitman Road, Melville, New York 11747. CopyTele is a pioneer in the field of electrophoretic and other thin film displays, having invented, marketed, and sold one of the world's first electrophoretic display devices. Over its 30-year history, CopyTele has received over one hundred U.S. and foreign patents covering numerous aspects of its display technologies, and currently holds 16 United States patents covering EPD Technologies (the "EPD Patents"), and 23 United States patents covering nFED Technologies (the "nFED Patents").

19.     Defendant AU Optronics Corporation is a Taiwanese corporation having its principal place of business at 1, Li-Hsin Rd., II, Science-Based Industrial Park, Hsinchu City 30077 Taiwan, Republic of China. AUOC manufactures its products in Taiwan and China and directs those products to the United States, including California, through established distribution channels involving various third parties, knowing that these third parties will use their respective nationwide contacts and distribution channels to import into, sell, offer for sale, and use these products in California and elsewhere in the United States.

-6-                           COMPLAINT FOR DAMAGES

1      20.    Defendant AU Optronics Corporation America is a domestic subsidiary of AUOC
2  that directly and indirectly imports into, sells, and offers for sale its products in California and
3  elsewhere in the United States. AUOCA is a California corporation, having its principal place of
4  business at 1525 McCarthy Blvd., Suite 216, Milpitas, California 95035. AUOCA markets and
5  sells AUO's products throughout the United States.

6      21.    Defendant E Ink Holdings, Inc. is a Taiwanese corporation having its principal
7  place of business at 1, 3 Li-Hsin Rd, 1 Hsinchu Science Park, Hsinchu 300 Taiwan, Republic of
8  China. E Ink Holdings manufactures electronic products, including electrophoretic displays used
9  in eReader devices such as the "Nook" and the "Kindle", in Taiwan and the People's Republic of
10  China, and directs those products to the United States, including California, through established
11  distribution channels involving various third parties, knowing that these third parties will use their
12  respective nationwide contacts and distribution channels to import into, sell, offer for sale, and
13  use these products in California and elsewhere in the United States.

14      22.    Defendant E Ink Corporation is a domestic subsidiary of E Ink Holdings that
15  directly and indirectly imports into, sells, and offers for sale its products in California and
16  elsewhere in the United States. E Ink Corp. is a Delaware corporation, having its principal place
17  of business at 733 Concord Avenue, Cambridge, Massachusetts 02138. E Ink Corporation
18  markets and sells E Ink Holdings, Inc.'s products throughout the United States.

19                          **FACTUAL ALLEGATIONS**

20      23.    CopyTele has a 30-year history of inventing, developing, and patenting pioneering
21  display technologies. CopyTele's EPD Patents are fundamental to electrophoretic displays such
22  as those used in eReaders. Electrophoretic displays are low voltage, high resolution, black-and-
23  white displays that can be easily viewed in a variety of lighting conditions including bright
24  sunlight. Analysts estimate that approximately 20 million eReaders were sold in the United
25  States in 2012 under brand names such a "Kindle" and "Nook," and worldwide sales of eReaders
26  are expected to reach \$6 billion by 2014.

27      24.    CopyTele's nFED Patents cover the use of low voltage color phosphors, specially
28  coated carbon nanotubes, and nano materials to generate secondary electrons and ionized noble

-7-                                    COMPLAINT FOR DAMAGES

1    gas, resulting in thin, flat panel displays with a bright, sharp, high contrast color image. Displays

2    incorporating CopyTele's nFED Technologies would be less expensive to manufacture, use less

3    power, and provide superior picture quality to traditional LCD and LED displays commonly used

4    for computers, tablets, and televisions. The potential market for products developed using

5    CopyTele's nFED Technologies is large: analysts estimate that in 2012, global sales of LCD

6    displays for televisions were expected to reach 240 million units, and LCD displays for tablets

7    were expected to reach 119 million units.

8        25.     Despite its small size and relatively modest product offerings, CopyTele has been

9    acknowledged as an "initial owne[r] of e-paper display technology" and a "knowledge diffuse[r]

10    of the e-paper display technology." *See* Jang, Show-ling. et al., *Emerging firms in an emerging*

11    *field: an analysis of patent citations in electronic-paper display technology*, 89 SCIENTOMETRICS

12    1, 259-272 (2011).

13        26.     AUO is one of the world's largest manufacturers of flat panel LCD displays for

14    televisions, computers, and tablets, including the Apple iPads.

15        27.     AUO has a history of fraudulent, anti-competitive, and illegal conduct. AUO's

16    former president and vice-president were recently sentenced to serve three years in United States

17    Federal Prison for AUO's role in "the most serious price-fixing cartel ever prosecuted by the

18    United States." *See* Kendall, Brent, *U.S. Seeks $1 Billion Price-Fixing Fine for AU Optronics*,

19    Wall St. J., Sept. 12. 2012, *available at*

20    http://online.wsj.com/article/SB10000872396390443884104577647470003233182.html. AUO

21    was ordered to pay a record $500 million fine, and agreed to pay an additional $199.5 million to

22    settle two class action lawsuits, all emanating from antitrust, anti-competitive activities engaged

23    in by AUO.

24        28.     E Ink is the dominant, worldwide manufacturer and supplier of electrophoretic

25    displays, including those used in eReaders sold under the "Kindle," and "Nook" brand names. E

26    Ink's electrophoretic displays include the "Pearl," "SURF," and "Vizplex" displays.

27        29.     In September 2010, AUO approached CopyTele about purchasing a subset of

28    CopyTele's EPD Patents for $1.5 million. CopyTele declined AUO's offer, but proposed that

- 8 -          COMPLAINT FOR DAMAGES

1    CopyTele and AUO jointly develop the EPD Products. CopyTele agreed to exclusively license

2    its EPD Patents to AUO only in connection with such joint development efforts. CopyTele

3    emphasized the paramount importance of the CopyTele/AUO joint development project as part of

4    the arrangement with AUO, including future royalties to be paid by AUO to CopyTele from the

5    sale of jointly developed EPD Products. Without the joint development commitment from AUO,

6    CopyTele was unwilling to license or sell any of its EPD Patents to AUO.

7           30.     At the same time that CopyTele and AUO were discussing the joint development

8    of EPD Products, CopyTele and AUO entered into discussions regarding the joint development of

9    nFED Products, incorporating CopyTele's patented nFED Technologies, including a license to

10   CopyTele's nFED Patents in connection with such joint development. CopyTele had previously

11   licensed certain rights to its nFED technologies to Videocon Industries, Ltd., and thus any

12   CopyTele nFED license to AUO would be non-exclusive. Again, CopyTele's and AUO's joint

13   development efforts were to be a material part of any nFED arrangement between CopyTele and

14   AUO, and without the joint development commitment from AUO, there would be no license of

15   CopyTele's nFED Patents to AUO.

16          31.     In consideration for the licenses to CopyTele's EPD Technologies and CopyTele's

17   nFED Technologies, AUO was to pay CopyTele a *de minimis* initial payment, considerable

18   progress payments, and significant running royalties that were tied to sales of the EPD Products

19   and the nFED Products. The initial payments alone were significantly less than CopyTele would

20   have demanded for licenses to the EPD Patents and the nFED Patents, and significantly less than

21   market rates for equivalent licenses.

22          32.     During the negotiations related to the agreements for the EPD and nFED Products,

23   CopyTele made clear the importance of AUO's joint development responsibilities and insisted

24   that AUO adhere to the highest "best efforts" standard with respect to its joint development·

25   obligations.

26          33.     The EPD Agreement and the nFED Agreement are attached hereto as Exhibits A

27   and B, respectively. Both Agreements contained "joint development" obligations that required

28   both parties to "make their best efforts to jointly develop" products covered by the licenses

- 9 -                 COMPLAINT FOR DAMAGES

1  ████████████████████████████████████  Section 6.12 of the EPD Agreement

2  states:

3      Licensor and Licensee will discuss and conclude a joint
       development agreement for the Subject EPD Products as soon as
4      practicable after the Effective Date hereof **and will make their
       best efforts to jointly develop the Subject EPD Products**
5      ██████████████

6  *See* Exh. A (emphasis added). Section 5.12 of the nFED Agreement states:

7      Licensor and Licensee will discuss and conclude a joint
       development agreement for the Subject Nano Display Products as
8      soon as practicable after the Effective Date hereof **and will make
       their best efforts to jointly develop the Subject Nano Display
9      Products**
       ██████████████

10

11  *See* Exh. B (emphasis added).

12      34.    However, AUO did not come close to fulfilling its "best efforts" obligations in

13  connection with the joint development of either the EPD Products or the nFED Products. Instead

14  AUO devoted only minimal resources to the joint development of the EPD Products and nFED

15  Products, did not fulfill its most basic joint development responsibilities, and impeded

16  CopyTele's progress in both joint development programs.

17      35.    On October 5, 2012, due to AUO's material breaches of both the EPD Agreement

18  and the nFED Agreement, CopyTele notified AUO of CopyTele's intent to terminate both

19  Agreements.

20      36.    Between October 5, 2012 and November 2, 2012, AUO declined CopyTele's

21  invitations to meet with AUO for the purposes of discussing the possibility of AUO curing

22  AUO's breaches of the EPD Agreement and the nFED Agreement, and attempting to amicably

23  resolve all outstanding issues with respect to the Agreements.

24      37.    On January 28, 2013, due to AUO's continuing material breaches, CopyTele

25  terminated and alternatively rescinded both the nFED Agreement and the EPD Agreement. A

26  true and correct copy of the notice is attached to this Complaint as Exhibit C.

27

28

- 10 -                    COMPLAINT FOR DAMAGES

**AUO BREACHED THE nFED AGREEMENT**

38.     On April 24, 2012, with no advance notice to or consultation with CopyTele, James Chen of AUO's "Strategy Office" notified CopyTele that AUO unilaterally canceled the entire budget in connection with the joint development of the nFED Products, effective immediately. In that notice, Mr. Chen requested that CopyTele "discuss the closure of the nFED Agreement." AUO's decision to terminate all funding for the nFED joint development project was a violation of the "best efforts" obligation agreed to by AUO in the nFED Agreement, and constituted a material breach of the nFED Agreement by AUO, giving rise to CopyTele's right to terminate the nFED Agreement in its entirety.

39.     AUO's unilateral decision to cancel the nFED Product development budget in its entirety, and for CopyTele immediately to halt all development work, resulted in significant financial hardship to CopyTele. CopyTele incurred significant out of pocket costs and expenses in reliance on AUO's promise to use its "best efforts" in connection the joint development of the nFED products. For example, CopyTele paid for both supplemental research by an outside consulting firm, and for specific equipment and supplies that were necessary for CopyTele's responsibilities under the nFED Agreement. CopyTele also devoted significant internal staff and resources in connection with its joint development responsibilities. In addition to these expenses, AUO's material breach of the nFED Agreement made it impossible for CopyTele to qualify for $          of progress payments which AUO agreed to pay CopyTele, and significant running royalties that were to be paid by AUO to CopyTele in connection with the sale of nFED Products. The initial nFED Product that AUO and CopyTele agreed to jointly develop was a tablet-sized device. Of the 119 million tablets expected to be sold in 2012, a substantial portion of the tablets were iPads for which AUO manufactured the displays for Apple, illustrating the large potential market for such a jointly developed product. When considering the combination of CopyTele's out of pocket costs and expenses, progress payments to be paid by AUO to CopyTele, and lost royalties to be paid by AUO to CopyTele in connection with jointly developed nFED Products, CopyTele's damages in connection with AUO's breaches of the nFED Agreement potentially amount to several hundred million dollars.

- 11 -                                    COMPLAINT FOR DAMAGES

1

## AUO BREACHED THE EPD AGREEMENT

2    40.    Despite AUO's "best efforts" obligations under the EPD Agreement, AUO failed
3   to devote appropriate personnel and resources to the joint development of the EPD Products. On
4   information and belief, AUO significantly understaffed the projects by devoting at most two
5   inexperienced employees to the EPD Product joint development project at any one time, far fewer
6   than was necessary to make reasonable progress on the project, and as was required by AUO's
7   "best efforts" obligations. In fact, AUO appeared to implement a "revolving door" staffing
8   strategy with respect to both the EPD Product and nFED Product joint development programs.
9   For example, with respect to the EPD Product joint development program, CopyTele was asked
10  to work with three different supervising managers and five different working scientists within one
11  seven-month span. As soon as CopyTele would begin to make progress with a supervising
12  manager or scientist from AUO, AUO would reassign those people and replace them with
13  personnel that were unfamiliar with the joint development program and in many cases,
14  completely unfamiliar with the technology to be developed.

15    41.    In addition to not fulfilling its own joint development obligations, AUO actively
16  prohibited CopyTele from completing CopyTele's work on the EPD Products. As part of its joint
17  development efforts, CopyTele required certain software code from AUO to drive AUO's K1900
18  EPD timing controller, a computer controller that was to be used to test suspension fluids
19  developed by CopyTele. AUO refused to provide the necessary software code, on the grounds
20  that SiPix, AUO's own subsidiary, deemed the code to be proprietary. Thus, AUO took the
21  position that its wholly owned-subsidiary—essentially AUO itself—would not allow it to provide
22  essential technical information to CopyTele that was required for the progress of the EPD joint
23  development program.

24    42.    AUO's refusal to supply the necessary software code for the K1900 EPD timing
25  controller constituted a violation of AUO's "best efforts" obligations, and a material breach of the
26  EPD Agreement, giving rise to CopyTele's right to terminate the EPD Agreement in its entirety.
27  Without the software code, CopyTele was forced to incur significant out-of-pocket costs for the
28  development of its own software, which was needed for testing purposes. In addition, these

- 12 -                                                    COMPLAINT FOR DAMAGES

1   actions prevented CopyTele from reaching the milestones for which $    would have been
2   paid by AUO to CopyTele.

3       43.    AUO additionally failed to timely supply test cells needed by CopyTele for its
4   joint development work under the EPD Agreement. Without the timely delivery of the test cells,
5   AUO also prevented CopyTele from progressing in its scheduled development work.

6       44.    As a last minute, wholly ineffectual attempt to excuse their behavior once
7   CopyTele notified AUO of CopyTele's intent to terminate the EPD Agreement, AUO claimed
8   that CopyTele had not developed the necessary suspension fluids for which the test cells were to
9   be used. However, contrary to AUO's assertions, CopyTele had several suspension fluids ready
10  for testing before the parties even entered into the EPD Agreement. Dr. Fan Luo, of AUO,
11  personally reviewed these suspensions during a visit to CopyTele's facilities in November of
12  2010. These suspensions were available to be used with the test cells, had AUO provided them to
13  CopyTele in a timely manner. Finally, after many requests by CopyTele, and an embarrassing
14  acknowledgement by Dr. Fan Luo during a visit to CopyTele's offices in July of 2012 that AUO
15  had not lived up to its obligations under the EPD Agreement, the test cells were sent to CopyTele
16  in August of 2012 following an inexcusable 12 month delay.

17      45.    Taken separately, the unreasonable delays in connection with the test cells, and the
18  outright refusal of AUO to provide CopyTele with the necessary software code to be used in
19  conjunction with the test cells, are each significant violations of AUO's "best efforts" obligations
20  under the EPD Agreement and constitute material beaches resulting in CopyTele's right to
21  terminate the EPD Agreement. Taken together, such actions overwhelmingly support CopyTele's
22  right to terminate the EPD Agreement in its entirety, and to seek damages in connection
23  therewith.

24      46.    It has been estimated that over 35 million eReader EPD Products were sold in
25  2012 worldwide. When considering the combination of CopyTele's out-of-pocket costs and
26  expenses in connection with the development of software that was to be provided by AUO, the
27  $    in progress payments that CopyTele did not receive due to AUO's delays in delivering
28  the test cells, and the lost royalties to be paid by AUO to CopyTele in connection with initial EPD

- 13 -        COMPLAINT FOR DAMAGES

1   Products to be jointly developed by CopyTele and AUO, CopyTele's damages in connection with

2   AUO's breaches of the EPD Agreement potentially amount to several hundred million dollars.

3   ### AUO FRAUDULENTLY INDUCED COPYTELE INTO LICENSING ITS EPD AND nFED PATENTS

4

5   47.     On information and belief, AUO never intended to jointly develop the nFED

6   Products with CopyTele, and instead sought to use the joint development programs as a ruse to

7   obtain licenses to CopyTele's nFED Patents for significantly less than CopyTele would have

    otherwise been willing to license them.

8
    48.     On information and belief, AUO induced CopyTele to enter the Agreements by
9
    making misrepresentations of fact and/or by making promises without any reasonable grounds to
10
    believe them. AUO led CopyTele to believe, through misrepresentations, that AUO was
11
    committed to jointly developing products under both Agreements when AUO had no reasonable
12
    grounds to believe that it would perform its contractual obligations. These misrepresentations
13
    include, without limitation: (1) the "best efforts" clauses included in both multiple drafts of the
14
    Agreements and the final versions; (2) AUO's repeated written and oral statements that it
15
    intended to jointly develop royalty-bearing products with CopyTele, including but not limited to:
16
            i.      During an August 12, 2010 meeting with CopyTele management, AUO
17
    gave a presentation regarding AUO's intent to work jointly with CopyTele to improve AUO's
18
    existing display technology.
19
            ii.     On September 24, 2010, C.W. Hao, AUO's Marketing Director, emailed
20
    Denis Krusos acknowledging AUO's obligation to "co-work" with CopyTele to develop nFED
21
    Products as an "assumption" and a "constraint" of the patent licensing agreement that the
22
    companies were negotiating.
23
            iii.    During a November 30, 2010 meeting with CopyTele management, AUO
24
    stated that CopyTele would be a source of research and development to AUO, not just a source of
25
    licensing technology.
26

27

28

                                        - 14 -                    COMPLAINT FOR DAMAGES

1            iv.      During a December 1, 2010 meeting with CopyTele management, AUO

2 stated that AUO and CopyTele would work together as a team to prevent E Ink from infringing

3 on CopyTele's patents, possibly through litigation.

4            v.       On January 10, 2011, Hank M. Liu, Chief General Counsel at AUO stated

5 in an email to Denis Krusos that AUO intends to "invest a lot of resources in a joint development

6 project."

7            vi.      On March 3, 2011, Eric Lo, of AUO's Strategic Business Development

8 office stated in an email to Anthony Campisi that AUO was seriously evaluating CopyTele's

9 technology for its mass production potential.

10            vii.     During a meeting on November 29, 2010, CW Hao, AUO's Marketing

11 Director, stated that AUO could beat E Ink on manufacturing costs. Mr. Hao also stated that with

12 CopyTele's improved electrophoretic technology, the fruits of the joint development program

13 would replace E Ink in the eReader market.

14            viii.    Eric Lo, of AUO's Strategic Business Development office, claimed that

15 there was no way E Ink could compete with AUO on price with CopyTele's electrophoretic

16 technology, and that AUO and CopyTele could together accordingly replace E Ink as the provider

17 of electrophoretic displays to Amazon.

18            ix.      At a meeting on February 19, 2011, Paul Peng, AUO's President, reported

19 that AUO's EPD Group was excited about the electrophoretic display wall structure that

20 CopyTele proposed for the joint development project.

21       49.      AUO's continual delays, insufficient staffing, and failures to provide CopyTele

22 with the software and substrates necessary for EPD Product testing demonstrate that despite

23 periodic statements to the contrary, AUO had no intention of using "best efforts" to jointly

24 develop the EPD Products with CopyTele. Instead, AUO used the EPD Agreement as an excuse

25 to obtain a license to the EPD Patents, which AUO intended to pass on to E Ink, in conjunction

26 with and in exchange for the $50 million paid by E Ink to AUO in connection with the sale of

27 SiPix to E Ink.

28

-15-                        COMPLAINT FOR DAMAGES

1   50. AUO's outright cancellation of the nFED Product development budget only a few
2   months into the program demonstrates that AUO had no intention of using "best efforts" to jointly
3   develop the nFED Products with CopyTele. Instead, AUO used the joint development program
4   as an excuse to ensure that CopyTele would not develop nFED Products that would compete with
5   successful tablet products already manufactured and sold by AUO, and to obtain a license to
6   CopyTele's valuable nFED Patents.

7   51. On information and belief, AUO's scheme to defraud CopyTele was predicated, in
8   part, upon the assumption that because CopyTele is a small company, and the EPD Agreement
9   and the nFED Agreement were the only potential sources of income for CopyTele, CopyTele
10  would be unwilling and unable to "fight back" against a billion-dollar industry behemoth like
11  AUO once AUO consummated its fraud. Indeed, AUO's fraud and breaches of the Agreements
12  have caused significant financial hardships to CopyTele, resulting in the layoff of many
13  employees, a decrease in its stock price, and the near bankruptcy and liquidation of the company.

14  52. On information and belief, the license payments to CopyTele due under the nFED
15  Agreement are far below the typical payments agreed to and made by AUO as part of other
16  similar license agreements, thereby demonstrating the success of AUO's fraudulent scheme.

17  53. Absent the agreement to jointly develop nFED Products, CopyTele would have
18  demanded significant license fees from AUO in return for a license to CopyTele's nFED Patents.

19  ## AUO AND E INK CONSPIRED TO FRAUDULENTY OBTIAN LICENSES TO
    ## COPYTELE'S EPD PATENTS

20

21  54. On August 5, 2012, AUO publicly announced that its wholly-owned
22  electrophoretic display company, SiPix, was to be sold to E Ink, the world's largest—and after
23  the acquisition of SiPix, essentially the only—manufacturer of electrophoretic displays. The
24  purchase price was approximately \$50 million.

25  55. Thus, only 15 months after entering into the EPD Agreement with CopyTele,
26  through which AUO and CopyTele agreed to jointly develop EPD Products that would have
27  competed with products sold by E Ink, AUO agreed to sell its electrophoretic display subsidiary
28  to E Ink for \$50 million.

- 16 -                                          COMPLAINT FOR DAMAGES

56. On information and belief, at the time that AUO entered into the EPD Agreement with CopyTele, AUO knew or had reason to know that AUO might sell SiPix to E Ink, that AUO intentionally concealed the potential sale from CopyTele, and that AUO never intended to jointly develop EPD Products with CopyTele.

57. Furthermore, on information and belief, at the time that AUO entered into the EPD Agreement with CopyTele, AUO sought sublicensing rights to CopyTele's EPD Patents for the undisclosed purpose of attempting to sublicense such rights in connection with the sale of SiPix to E Ink, the very company with which CopyTele and AUO were supposed to compete, as opposed to AUO's stated purpose of sublicensing to suppliers that were to assist in the joint development of the EPD Products. On information and belief, AUO concealed its true intentions and intentionally misled CopyTele.

58. E Ink publicly stated that a primary purpose of acquiring SiPix was to acquire SiPix's intellectual property in order to immunize E Ink from patent infringement actions, thereby effectively creating a total monopoly on electrophoretic display products. As reported in the press, "E Ink said as both companies own many [electrophoretic display] patents, it will be unnecessary after the acquisition for E Ink to worry about possible patent infringement disputes involving each other's technology." *See E Ink to acquire AUO's e-paper display supplier*, THE CHINA POST, Aug. 5, 2012, *available at* https://www.chinapost.com.tw/taiwan/national/national-news/2012/08/05/349925/E-Ink.htm.

59. Press reports have similarly stated that the purpose of the SiPix acquisition was likely the anticompetitive goal of avoiding price wars rather than obtaining any manufacturing capacity from SiPix. As stated in one press report:

> [E Ink's] motivation of the acquisition is to remove the only EPD competitor to avoid price-cut wars rather than to obtain SiPix's production capacity, according to industry sources in Taiwan. This is because [E Ink]'s production capacity has been in excess of ordered volumes in so far in 2012, the company actually does not need SiPix's production capacity, the sources pointed out. Instead, [E Ink's] will become the leading vendor for EPD e-paper without any competitor, equivalent to the only choice for the product, the sources explained.

- 17 - COMPLAINT FOR DAMAGES

1  *See* Huang, Sammi & Hwang, Adam, *E Ink acquisition of SiPix is for prevention of price wars*

2  *instead of obtaining capacity,* DIGITIMES, Aug. 21, 2012, *available at*

3  http://www.digitimes.com/news/a20120820PD223.html.

4      60.    On information and belief, CopyTele alleges that E Ink intended to obtain rights to

5  the EPD Patents as part of E Ink's overall scheme to monopolize the electrophoretic display

6  market and immunize itself from patent infringement lawsuits by patent owners such as

7  CopyTele.

8      61.    Despite Defendants receiving notice on October 5, 2012 of CopyTele's intention

9  to terminate the EPD Agreement, including any AUO sublicensing rights, and, on information

10  and belief, fearing that CopyTele had indeed discovered the fraud perpetrated by AUO and E Ink,

11  AUO and E Ink jointly publicly announced on October 12, 2012 that they had "agreed to cross

12  license specified patents owned by each party." *See* AUO press release dated October 12, 2012,

13  *available at* http://auo.com/?sn=107&lang=en-US&c=&n=1452. On information and belief, the

14  cross-licensing agreement included a sublicense from AUO to E Ink to CopyTele's EPD Patents.

15      62.    A week later, on October 18, 2012, AUO wrote to CopyTele that with respect to

16  the EPD Patents, "as the exclusive licensee, AUO has been exercising its rights as allowed under

17  the agreement including entering into a patent cross license agreement with E Ink."

18      63.    On information and belief, AUO and E Ink conspired to effectuate a fraudulent

19  sublicense of CopyTele's EPD Patent rights to E Ink, by inducing CopyTele to grant AUO

20  sublicensing rights in connection with the EPD Products to be jointly developed by CopyTele and

21  AUO, and by effectuating such sublicense after being notified of CopyTele's intention to

22  terminate the EPD Agreement.

23      64.    At the time that CopyTele entered into the EPD Agreement, CopyTele never

24  envisioned that AUO would sublicense the EPD Patents to E Ink, and CopyTele would never

25  have agreed to such sublicense, particularly with CopyTele receiving nothing in return.

26      65.    On information and belief, E Ink was aware of AUO's intentions to fraudulently

27  induce CopyTele to enter into the EPD Agreement, and aided and abetted AUO's fraudulent

28

-18-           COMPLAINT FOR DAMAGES

1  inducement by providing material support and incentive to AUO to commit fraud by offering to

2  purchase SiPix in exchange for, *inter alia*, sublicenses to CopyTele's EPD Patents.

3      66.    To make matters worse, on information and belief, AUO and E Ink further

4  perpetrated their fraud in connection with CopyTele's EPD Patents by attempting to protect and

5  license infringing eReader devices sold by E Ink over the past several years. At the time that

6  CopyTele entered into the EPD Agreement with AUO, CopyTele granted AUO exclusive

7  enforcement rights to the EPD Patents with the understanding and intent that because AUO was a

8  multi-billion dollar company with extensive resources, AUO would pursue all infringers of

9  CopyTele's EPD Patents. Instead of enforcing CopyTele's EPD Patent rights against E Ink, AUO

10  attempted to secretly sublicense the EPD Patents to E Ink, with no notice to CopyTele and with

11  CopyTele receiving no consideration.

12      67.    Direct statements by AUO's top officials attest to AUO's fraudulent intent. While

13  visiting CopyTele's facilities in New York in April 2012, after a year of unreasonable delays and

14  refusals to cooperate by AUO, Dr. Fan Luo stated to CopyTele's Chairman, Lewis Titterton, that

15  Apple, Inc. and other large American companies had been "screwing" AUO for years by taking

16  AUO's intellectual property without compensation. Mr. Luo then made a statement, directly to

17  Mr. Titterton, to the following effect: "and now AUO is going to do the same to you." On

18  information and belief, Dr. Luo was referring to AUO's—by then largely executed—scheme to

19  fraudulently induce CopyTele into licensing its patents to AUO in exchange for the false promise

20  of potential royalties from jointly developed products.

21                        **ANTITRUST ALLEGATIONS**

22  **I.    Relevant Product Market: Electrophoretic Display Technologies For eReaders.**

23      68.    Electrophoretic displays, which are used in consumer devices commonly known as

24  eReaders, are low voltage, high resolution, black-and-white displays that can be easily viewed in

25  a variety of lighting conditions including bright sunlight. In the most common implementation of

26  an electrophoretic display, millions of white titanium dioxide and carbon black particles are

27  suspended in a clear solution of hydrocarbon oil. These particles usually have a diameter of less

28  than a micrometer (1/1000 of a millimeter). Charging agents are added to give the titanium

- 19 -           COMPLAINT FOR DAMAGES

dioxide and carbon black particles opposite charges. The particles are suspended in the oil between two parallel conducive plates about 10 to 100 micrometers apart. The parallel conductive plates connect to circuitry that allows external signals to manipulate the electric charge at precise points on the display. By manipulating the charge at these precise points, the black and white particles will move in opposite directions and either migrate to the viewing surface or the back surface of the display. This effect is called "electrophoresis," after which the display is named. At the surface, the white particles scatter light appearing bright white, while black particles at the surface make that point black. By manipulating the charge at precise points over the entire display an image is created. Using color filters allows the display of the full visual spectrum.

69.     Demand for electrophoretic displays is highly inelastic. For example, for eReader devices such as Amazon's "Kindle" and Barnes & Noble's "Nook," there are no close substitutes.

**II.     The Development, Manufacture, and Sale of Electrophoretic Displays Is A Line Of Commerce In A Relevant Product Market.**

70.     E Ink is the leading electrophoretic display manufacturer in the world. Entry into the development, manufacture, and sale of electrophoretic displays is difficult, time-consuming, and costly. The technology is highly protected by patents, including CopyTele's EPD Patents. A facility to manufacture electrophoretic displays costs in excess of $1 billion and can take up to two years to design and build.

**III.     E Ink's Monopoly Power in the Relevant Market.**

71.     E Ink is one of the only electrophoretic display manufacturers in the world. As of 2012, E Ink accounted for 90 percent of the electrophoretic display sales in the world. Since E Ink's acquisition of SiPix, E Ink's share of the relevant market has increased to almost 100 percent, and therefore E Ink has monopoly power in the market for electrophoretic displays. On information and belief, through E Ink's aiding and abetting and conspiring with AUO to fraudulently obtain licenses to CopyTele's EPD Patents, E Ink now purports to have sublicenses to the patents that are fundamental to electrophoretic display technology.

-20-

COMPLAINT FOR DAMAGES

72.     To manufacture and sell electrophoretic displays, an entrant needs licenses to CopyTele's EPD Patents. On information and belief, through their fraudulent conspiracy directed at CopyTele, E Ink and AUO purport to have obtained control over critical patents for the design, manufacture, and building of electrophoretic displays.

## IV.   E Ink's Monopoly Position Strengthened With The Acquisition Of Licenses To CopyTele's EPD Patents.

73.     E Ink publicly stated that a primary purpose of acquiring SiPix was to acquire SiPix's intellectual property, in order to immunize E Ink from patent infringement actions, thereby effectively creating a total monopoly on electrophoretic displays products; as reported in the press, "E Ink said as both companies own many [electrophoretic display] patents, it will be unnecessary after the acquisition for E Ink to worry about possible patent infringement disputes involving each other's technology." *See E Ink to acquire AUO's e-paper display supplier*, THE CHINA POST, Aug. 5, 2012, *available at* https://www.chinapost.com.tw/taiwan/national/national-news/2012/08/05/349925/E-Ink.htm.

74.     Press reports have stated that the purpose of the SiPix acquisition was likely the anticompetitive goal of avoiding price wars rather than obtaining any manufacturing capacity from SiPix, and have noted that as a result of the acquisition, E Ink has "become the leading vendor for EPD e-paper without any competitor, equivalent to the only choice for the product:"

> [E Ink's] motivation of the acquisition is to remove the only EPD competitor to avoid price-cut wars rather than to obtain SiPix's production capacity, according to industry sources in Taiwan. This is because [E Ink]'s production capacity has been in excess of ordered volumes in so far in 2012, the company actually does not need SiPix's production capacity, the sources pointed out. Instead, [E Ink's] will become the leading vendor for EPD e-paper without any competitor, equivalent to the only choice for the product, the sources explained.

*See* Huang, Sammi & Hwang, Adam, *E Ink acquisition of SiPix is for prevention of price wars instead of obtaining capacity*, DIGITIMES, Aug. 21, 2012, *available at* http://www.digitimes.com/news/a20120820PD223.html.

- 21 -                                          COMPLAINT FOR DAMAGES

1

## CLAIMS FOR RELIEF

2

### FIRST CLAIM FOR RELIEF
**Attempted Monopolization**
**(Section 2 of the Sherman Act, 15 U.S.C. § 2)**
**(Against E Ink)**

3

4

75.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if

5

fully set forth here and further alleges:

6

76.    E Ink and AUO agreed, combined, and conspired to attempt to acquire and

7

maintain monopoly power in the market for electrophoretic display products. Pursuant to these

8

agreements, accommodations, and conspiracy, E Ink attempted to acquire monopoly power and

9

maintain it by acquiring, sublicensing, and cross-licensing CopyTele's and others' electrophoretic

10

display technology patents. As a result, these agreements, combinations, and conspiracies had a

11

dangerous probability of harming competition in the market for electrophoretic display products

12

including eReaders.

13

77.    CopyTele has suffered injury in its business or property as a result of E Ink's

14

attempt to monopolize the electrophoretic display market because CopyTele has been deprived of

15

developing, manufacturing, and licensing its EPD Technologies. Consumers will be harmed by

16

the sale of E Ink's electrophoretic display products as there is no competition as a result of

17

Defendants' agreements, accommodations, and conspiracy to monopolize the market for

18

electrophoretic display products such as eReaders.

19

78.    Defendants' violation of the antitrust laws and their supra-competitive prices will

20

result in ill-gotten monopoly profits to E Ink.

21

79.    As a result of E Ink's attempted monopolization, CopyTele is entitled to treble

22

damages, according to proof, pre-judgment interest, injunctive relief, and attorneys' fees and

23

costs.

24

### SECOND CLAIM FOR RELIEF
**Conspiracy to Monopolize**
**(Section 2 of the Sherman Act, 15 U.S.C. § 2)**
**(Against all Defendants)**

25

26

27

80.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if

28

fully set forth here and further alternatively alleges:

- 22 -                          COMPLAINT FOR DAMAGES

1    81.    An agreement or mutual understanding between E Ink and AUO existed to obtain

2    monopoly power in the market for electrophoretic displays and products incorporating

3    electrophoretic displays such as eReaders. E Ink and AUO knowingly, voluntarily, and

4    intentionally, became parties to that agreement or mutual understanding.

5    82.    E Ink and AUO intended that they would obtain or maintain monopoly power in

6    the market for electrophoretic displays.

7    83.    E Ink and AUO committed overt acts in furtherance of the conspiracy to

8    monopolize, including but not limited to AUO agreeing to sell SiPix, and E Ink agreeing to buy

9    SiPix, AUO defrauding and inducing CopyTele to license CopyTele's EPD Patents to AUO under

10   the guise of a joint product development arrangement, and AUO's clandestine sublicense of

11   CopyTele's EPD Patents to E Ink.

12   84.    Defendants' activities occurred in or affected interstate and/or foreign commerce.

13   85.    As a result of Defendants' conspiracy, their scheme had a dangerous probability of

14   harming competition in the market for electrophoretic displays. CopyTele has suffered injury in

15   its business or property as a result of E Ink's attempt to monopolize the electrophoretic display

16   market because CopyTele has been deprived of developing, manufacturing, and licensing its own

17   products utilizing its EPD Technologies. Consumers will be harmed by the sale of E Ink's

18   electrophoretic display products as there is no competition as a result of Defendants' agreements,

19   accommodations, and conspiracy to monopolize the market for electrophoretic displays.

20   86.    CopyTele is entitled to treble damages, according to proof, pre-judgment interest,

21   injunctive relief, and attorneys' fees and costs.

22
23
### THIRD CLAIM FOR RELIEF
#### Breach Of Contract
#### (Against AUO)

24   87.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if

25   fully set forth here and further alleges:

26   88.    CopyTele entered into the EPD Agreement and the nFED Agreement with AUO.

27   89.    The "best efforts" clauses of both Agreements required AUO to employ diligent

28   efforts to jointly develop the nFED Products and EPD Products.

- 23 -                                    COMPLAINT FOR DAMAGES

1       90.    CopyTele performed its obligations under both Agreements—including employing

2 its "best efforts" to jointly develop products—to the extent possible in light of AUO's active

3 impediments to progress on both joint development projects.

4       91.    Cancellation of the nFED Agreement budget by AUO was both a breach of the

5 "best efforts" obligation agreed to by AUO, and a material breach of the nFED Agreement.

6       92.    In reliance on AUO's "best efforts" joint development obligations, CopyTele

7 incurred significant out-of-pocket expenses, and significant internal development costs, in

8 connection with the nFED Products. As a result of AUO's breaches of the nFED Agreement,

9 CopyTele was also deprived of $       in development payments to be paid by AUO to

10 CopyTele, in addition to significant royalties to be paid by AUO to CopyTele in connection with

11 the sale of the nFED Products.

12       93.    AUO's 12 month delay in supplying test cells to CopyTele, and AUO's refusal to

13 supply the necessary software code for the K1900 EPD timing controller, both constituted

14 breaches of AUO's "best efforts" obligations, and were material breaches of the EPD Agreement.

15       94.    Without the timely delivery of the test cells, AUO prevented CopyTele from

16 progressing in its scheduled development work. Without the software code, CopyTele was forced

17 to pay significant out of pocket costs for the development of its own software for testing

18 purposes. In addition, these actions prevented CopyTele from reaching the milestones for which

19 $      would have been paid by AUO to CopyTele. The milestone payments to be paid by

20 AUO to CopyTele, the expenses incurred by CopyTele in connection with the software which

21 was to be provided by AUO, and the significant royalties to be paid by AUO to CopyTele in

22 connection with the sale of the EPD Products, all represent damages incurred by CopyTele as a

23 result of AUO's breaches of the EPD Agreement.

24       95.    In addition, CopyTele granted sublicensing rights to AUO with the understanding

25 and intent that they would be used solely in connection with the manufacture, use, and sale of

26 jointly developed products. AUO's use of the sublicenses to frustrate the purpose of the

27 Agreements by sublicensing the patents to E Ink was also a material breach of the EPD

28 Agreement. CopyTele has been damaged by AUO's sublicensing of the EPD Patents to E Ink by,

1    *inter alia*, depriving CopyTele of the opportunity to develop EPD Products as contemplated under

2    the EPD Agreement.

3        96.    AUO's sale of SiPix—AUO's primary electrophoretic display manufacturing

4    subsidiary—to E Ink was a both breach of the "best efforts" obligation agreed to by AUO, and a

5    material breach of the Agreement. CopyTele has been damaged by AUO's sale of SiPix to AUO,

6    *inter alia*, depriving CopyTele of the opportunity to develop competing EPD products as

7    contemplated under the EPD Agreement.

8                    **FOURTH CLAIM FOR RELIEF**
                **Breach Of The Implied Covenant Of Good Faith And Fair Dealing**
9                    **(Against AUO)**

10       97.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if

11   fully set forth here and further alleges:

12       98.    California law implies a covenant of good faith and fair dealing in all contracts

13   between parties under California law.

14       99.    AUO was, at all relevant times, obligated under an implied covenant of good faith

15   and fair dealing not to take actions that would deliberately frustrate the rights of CopyTele and

16   the purpose of the Agreements.

17       100.   AUO breached the covenant of good faith and fair dealing implied in the

18   Agreements by denying CopyTele the benefit of its bargain by: (a) cancelling the budget for the

19   nFED Agreement joint development project; (b) failing to supply test cells and thereby inhibiting

20   CopyTele's ability to make progress on its EPD Product development work; (c) refusing to

21   supply the necessary software code for the K1900 EPD timing controller; and (d) selling its

22   electrophoretic display subsidiary to E Ink, thereby vitiating the parties' abilities to effectively

23   develop and market competing EPD Products. CopyTele has been damaged by these breaches.

24                    **FIFTH CLAIM FOR RELIEF**
                        **Fraudulent Inducement**
25                        **(Against AUO)**

26       101.   Plaintiff incorporates by reference all previous paragraphs of this Complaint as if

27   fully set forth here and further alleges:

28

- 25 -                              COMPLAINT FOR DAMAGES

1    102.    AUO fraudulently induced CopyTele to enter the Agreements by making
2 misrepresentations of fact and/or by making promises without any intention of performing them.
3 AUO led CopyTele to believe, through false representations, that AUO was committed to jointly
4 developing products under both Agreements when it had no intent of performing its contractual
5 obligations. These false representations include, without limitation: (1) the "best efforts" clauses
6 included in both multiple drafts and the final versions of the Agreements; (2) AUO's repeated
7 written and oral statements that it intended to jointly develop royalty-bearing products with
8 CopyTele, including but not limited to:

9         i.      During an August 12, 2010 meeting with CopyTele management, AUO
10 gave a presentation regarding AUO's intent to work jointly with CopyTele to improve AUO's
11 existing display technology.

12        ii.     On September 24, 2010, C.W. Hao, AUO's Marketing Director, emailed
13 Denis Krusos acknowledging AUO's obligation to "co-work" with CopyTele to develop nFED
14 Products as an "assumption" and a "constraint" of the patent licensing agreement that the
15 companies were negotiating.

16        iii.    During a November 30, 2010 meeting with CopyTele management, AUO
17 stated that CopyTele would be a source of research and development to AUO, not just a source of
18 licensing technology.

19        iv.     During a December 1, 2010 meeting with CopyTele management, AUO
20 stated that AUO and CopyTele would work together as a team to prevent E Ink from infringing
21 on CopyTele's patents, possibly through litigation.

22        v.      On January 10, 2011, Hank M. Liu, Chief General Counsel at AUO stated
23 in an email to Denis Krusos that AUO intends to "invest a lot of resources in a joint development
24 project."

25        vi.     On March 3, 2011, Eric Lo, of AUO's Strategic Business Development
26 office stated in an email to Anthony Campisi that AUO was seriously evaluating CopyTele's
27 technology for its mass production potential.

28

- 26 -                        COMPLAINT FOR DAMAGES

1    vii.    During a meeting on November 29, 2010, CW Hao, AUO's Marketing

2  Director, stated that AUO could beat E Ink on manufacturing costs. Mr. Hao also stated that with

3  CopyTele's improved electrophoretic technology, the fruits of joint development program would

4  replace E Ink in the eReader market.

5    viii.    Eric Lo, of AUO's Strategic Business Development office, claimed that

6  there was no way E Ink could compete with AUO on price with CopyTele's electrophoretic

7  technology, and that AUO and CopyTele could together accordingly replace E Ink as the provider

8  of electrophoretic displays to Amazon.

9    ix.    At a meeting on February 19, 2011, Paul Peng, AUO's President, reported

10  that AUO's EPD Group was excited about the electrophoretic display wall structure that

11  CopyTele proposed for the joint development project.

12    103.    Each of these statements was knowingly false when made. AUO made each of

13  these statements with intent to deceive or induce reliance on the part of CopyTele.

14    104.    CopyTele justifiably relied on these statements by agreeing to enter into the

15  Agreements. CopyTele suffered damages as a result AUO's fraudulent statements, including, but

16  not limited to, lost royalties and fees due under the Agreements, as well as development expenses

17  incurred by CopyTele in performing its obligations under the Agreements.

18    105.    AUO's fraud, concealment, misrepresentation, and unfulfilled promises, with the

19  intent to deceive, fraudulently induced CopyTele to enter into the EPD Agreement and nFED

20  Agreement. AUO suggested facts which were not true and positively asserted facts in a manner

21  that was not warranted by the information known at the time. AUO knew and suppressed the true

22  facts. As a result, CopyTele has been injured and has incurred significant damages. CopyTele is

23  therefore entitled to seek damages in an amount to be proven at trial, together with interest and

24  costs.

25    106.    AUO's conduct was malicious, intentional, and outrageous and constituted willful

26  and wanton disregard for the rights of others. Such conduct was specifically directed at CopyTele

27  and as such warrants an award of punitive damages.

28

- 27 -                              COMPLAINT FOR DAMAGES

1

2

## SIXTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Against AUO)

3   107. Plaintiff incorporates by reference all previous paragraphs of this Complaint as if

4   fully set forth here and further alleges:

5   108. AUO fraudulently obtained sublicensing rights to CopyTele's EPD Patents under

6   the false representation that AUO intended to jointly develop EPD Products in conjunction with

7   CopyTele.

8   109. CopyTele is informed and believes and based thereon alleges that AUO used these

9   sublicensing rights for its own financial and competitive benefit, by, *inter alia*, sublicensing the

10  EPD Patents to E Ink.

11  110. CopyTele has never been compensated for the value of the EPD Patent sublicenses

12  provided to E Ink.

13  111. AUO was unjustly enriched by sublicensing the EPD Patents to E Ink without

14  providing any consideration or value to CopyTele in return for such sublicense.

15

## SEVENTH CLAIM FOR RELIEF
### Unfair Business Practices (Bus. & Prof. Code §§ 17200, *et seq.*)
### (Against AUO and E Ink)

16

17  112. Plaintiff incorporates by reference all previous paragraphs of this Complaint as if

18  fully set forth here and further alleges:

19  113. CopyTele is informed and believes and based thereon alleges that Defendants have

20  engaged in unfair competition as defined by California Business and Professions Code sections

21  17200, *et seq.*, in that Defendants have used unfair, unlawful, and fraudulent business practices,

22  including false representations, in violation of state and federal law in the manners alleged herein.

23  114. CopyTele is informed and believes and based thereon alleges that in addition to the

24  practices described above, such practices include without limitation the use of fraud and

25  concealment to misappropriate CopyTele's proprietary intellectual property for Defendants' use

26  and benefit.

27  115. CopyTele is informed and believes and based thereon alleges that in doing the acts

28  alleged above, Defendants acted with the intent to obtain property or money from CopyTele by

- 28 -                                    COMPLAINT FOR DAMAGES

1 means of conduct that was unfair, fraudulent, illegal, or otherwise proscribed by Business and
2 Professions Code sections 17200, *et seq.*

3     116. As a direct and proximate result of Defendants' actions, CopyTele is entitled to
4 recover restitution and disgorgement of all money and property provided to Defendants by virtue
5 of their various acts of unfair competition and violations of Business and Professions Code
6 sections 17200, *et seq.*

7     117. CopyTele is further entitled to injunctive relief against Defendants to ensure that
8 they do not, directly or indirectly, commit further acts of unfair competition.

9
10

**EIGHTH CLAIM FOR RELIEF**
**Accounting**
**(Against AUO)**

11     118. Plaintiff incorporates by reference all previous paragraphs of this Complaint as if
12 fully set forth here and further alternatively alleges:

13     119. Under the EPD Agreement, Plaintiff is entitled to a fair and reasonable royalty in
14 exchange for the exclusive license to AUO, and a fair and reasonable portion of the consideration
15 received by AUO in connection with any and all sublicenses to the EPD Patents, including the
16 sublicense of the EPD Patents to E Ink.

17     120. On information and belief, AUO received valuable consideration from E Ink in
18 exchange for sublicenses to CopyTele's EPD Patents.

19     121. Plaintiff seeks an accounting of any consideration received by AUO from E Ink
20 and any other third parties, in connection with the sublicensing of CopyTele's EPD Patents.

21     122. CopyTele is entitled to an accounting of any consideration received by AUO
22 attributable to the sublicenses of the EPD Patents to E Ink and the calculation of royalties due and
23 owing in connection therewith. To date, AUO has failed to provide such an accounting.

24     123. The information sought as part of the accounting is complex and solely in the
25 possession of AUO.

26     124. CopyTele respectfully requests that the Court order AUO to account for any
27 consideration received by AUO attributable to the sublicenses of the EPD Patents to E Ink, the
28 calculation of royalties due and owing in connection therewith, and the payment of any royalties

- 29 -           COMPLAINT FOR DAMAGES

1  that remain due and owing, together with prejudgment interest, and grant such other relief as may

2  be just and proper.

### NINTH CLAIM FOR RELIEF
#### Aiding And Abetting Fraudulent Inducement
#### (Against E Ink)

5      125.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if

6  fully set forth here and further alleges:

7      126.    E Ink desired to obtain licenses to CopyTele's EPD Patents. On information and

8  belief, E Ink's Taiwanese predecessor, Prime View International, had approached CopyTele via

9  third parties, regarding potential licenses to or the acquisition of CopyTele's EPD Patents, but all

10  such inquiries were declined. E Ink's desire to obtain licenses to CopyTele's EPD Patents is

11  further demonstrated by the fact Barrett Comisky, one of the co-founders of E Ink, purchased one

12  of CopyTele's electrophoretic devices in December of 1999. At a subsequent trade show, an E

13  Ink employee acknowledged to CopyTele that E Ink had reverse-engineered CopyTele's device.

14      127.    On information and belief, E Ink was aware of AUO's scheme to fraudulently

15  induce CopyTele into providing sublicensing rights to AUO through the false promises to honor

16  the joint development agreements.

17      128.    On information and belief, E Ink was aware of AUO's scheme to fraudulently

18  induce CopyTele to enter into the EPD Agreement, and aided and abetted AUO's fraudulent

19  inducement by providing substantial support and incentive to AUO to commit fraud by offering

20  to purchase SiPix in exchange for, *inter alia*, sublicenses to CopyTele's EPD Patents obtained

21  through AUO's fraud.

22      129.    CopyTele was damaged by E Ink's conduct.

23

24

25

26

27

28

                    - 30 -               COMPLAINT FOR DAMAGES

1

2

<b><u>TENTH CLAIM FOR RELIEF</u></b><br>
<b>Civil Conspiracy</b><br>
<b>(Against AUO and E Ink)</b>

3    130.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if

4    fully set forth here and further alleges:

5    131.    On information and belief, E Ink was aware of AUO's scheme to fraudulently

6    induce CopyTele into providing sublicensing rights to AUO through the false promises to honor

7    the joint development agreements.

8    132.    On information and belief, E Ink conspired with AUO in agreeing to cooperate

9    with AUO's scheme to fraudulently induce CopyTele into providing sublicensing rights to AUO

10   through the false promises to honor the joint development agreements, and intended that the fraud

11   be committed.

12   133.    Defendants knowingly agreed to engage, and did engage, in one or more overt acts

13   in pursuit of the conspiracy as set forth with more particularity in this Complaint.

14   134.    CopyTele has been damaged by the conspiracy and Defendants' actions in

15   furtherance thereof.

16

17

<b><u>ELEVENTH CLAIM FOR RELIEF</u></b><br>
<b>Contract Reformation</b><br>
<b>(Against AUO)</b>

18   135.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if

19   fully set forth here and further alternatively alleges:

20   136.    The primary purpose and intent of the sublicensing provisions of Section 2.2 the

21   EPD Agreement was to allow AUO to sublicense the EPD Patents solely in connection with

22   manufacture, use, and sale of jointly developed EPD Products.

23   137.    It was never the purpose or intent of CopyTele to grant AUO sublicensing rights

24   that extend to the right to sublicense the EPD Patents to competitors, such as E Ink.

25   138.    To the extent contract provisions in the EPD Agreement purport to grant

26   sublicensing rights beyond those to that may be used solely in connection with manufacture, use,

27   and sale of jointly developed EPD Products, those provisions fail to reflect the meeting of the

28

- 31 -   <span style="float:right">COMPLAINT FOR DAMAGES</span>

1  minds of the parties to the agreement by virtue of unilateral mistake by CopyTele regarding the

2  nature and scope of the Section 2.2, and fraud or misrepresentation by AUO.

3      139.    The EPD Agreement should be reformed to limit any sublicensing rights to those

4  that may be exercised by AUO solely in connection with manufacture, use, and sale of jointly

5  developed products.

## TWELFTH CLAIM FOR RELIEF
### Negligent Misrepresentation
### (Against AUO)

8      140.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if

9  fully set forth here and further alternatively alleges:

10      141.    AUO induced CopyTele to enter the Agreements by making misrepresentations of

11  fact and/or by making promises without any reasonable grounds to believe them. AUO led

12  CopyTele to believe, through misrepresentations, that AUO was committed to jointly developing

13  products under both Agreements when AUO had no reasonable grounds to believe it would

14  perform its contractual obligations. These misrepresentations include, without limitation: (1) the

15  "best efforts" clauses included in both multiple drafts of the Agreements and the final versions;

16  (2) AUO's repeated written and oral statements that it intended to jointly develop royalty-bearing

17  products with CopyTele, including but not limited to those set forth in paragraph 102 above.

18      142.    AUO's misrepresentations induced CopyTele to enter into the EPD Agreement

19  and the nFED Agreement. AUO suggested facts which were not true and positively asserted facts

20  in a manner that was not warranted by the information known at the time. AUO knew and

21  suppressed the true facts. As a result, CopyTele has been injured and has incurred damages.

22  Plaintiff is therefore entitled to seek damages in an amount to be proven at trial, together with

23  interest and costs.

24

25

26

27

28

- 32 -          COMPLAINT FOR DAMAGES

1

2

**THIRTEENTH CLAIM FOR RELIEF**
**Declaratory Judgment**
**(Against AUO and E Ink)**

3    143.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if

4    fully set forth here and further alleges:

5    144.    By virtue of AUO's material breach of both Agreements and fraudulent

6    inducement, CopyTele has the right to cancel, terminate and/or rescind both Agreements.

7    145.    Plaintiff seeks a declaration that the EPD Agreement and the nFED Agreement

8    have been duly cancelled, terminated and/or rescinded, and that AUO is no longer entitled to

9    sublicensing rights, and that any purported sublicenses of the EPD Patents to E Ink and any other

10    third parties are invalid.

11

**PRAYER FOR RELIEF**

12    WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as

13    follows:

14    1.    For judgment in favor of CopyTele against Defendants on all claims for relief;

15    2.    For a declaration that the EPD Agreement and the nFED Agreement have been

16    duly cancelled, terminated, and/or rescinded pursuant to California Civil Code. § 1689 et seq.,

17    and that AUO is no longer entitled to sublicensing rights, and that any purported sublicenses of

18    the EPD Patents to E Ink and any other third parties are invalid.

19    3.    For the damages CopyTele has sustained as a result of Defendants' breaches and

20    fraud;

21    4.    For an accounting to determine the amount of damages sustained by CopyTele as a

22    result of Defendants' breaches and fraud;

23    5.    For CopyTele's costs of suit and reasonable attorneys' fees incurred in bringing

24    this action;

25    6.    For treble, punitive and exemplary damages according to proof against all

26    Defendants;

27    7.    For injunctive relief;

28    8.    For an award of prejudgment interest, costs, and disbursements; and

- 33 -                    COMPLAINT FOR DAMAGES

1    9.    For such other and further relief as the Court deems equitable or appropriate under

2  the circumstances.

3

4                                    **JURY DEMAND**

5        Plaintiff CopyTele, Inc. hereby demands a Jury Trial on all issues so triable.

6

7  Dated: January 28, 2013              LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

8                                        By: _____
                                              Eric B. Fastiff
9

10                                       Eric B. Fastiff (State Bar No. 182260)
                                         (efastiff@lchb.com)
11                                       David T. Rudolph (State Bar No. 233457)
                                         (drudolph@lchb.com)
                                         275 Battery Street, 29th Floor
12                                       San Francisco, CA 94111-3339
                                         Phone: 415.956.1000
13                                       Fax: 415.956.1008

14                                       *Attorneys for Plaintiff CopyTele, Inc.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                         - 34 -                    COMPLAINT FOR DAMAGES

Exhibit A

CONFIDENTIAL

## EXCLUSIVE LICENSE AGREEMENT

This Exclusive License Agreement ("Agreement"), dated and effective as of May 27th, 2011 ("Effective Date"), is made and entered into by and between CopyTele Inc., having its office at 900 Walt Whitman Road, Melville, New York 11747 ("Licensor"), on the one hand, and AU Optronics Corp. ("Licensee"), having its office at 1 Li-Hsin Road 2, Hsinchu Science Park, Hsinchu, Taiwan, on the other hand.

In consideration of the mutual covenants and obligations herein undertaken, Licensor and Licensee agree as follows:

Article 1. Definitions

In this Agreement, the following terms shall have the respective meanings set forth below:

1.1    "EPD" means electrophoretic display.

1.2    "Licensed Technology" means know how, technical information, engineering data, specifications of materials and other information owned or controlled by Licensor and/or its Subsidiaries relating to EPD.

1.3    "Licensed Patents" means any and all patents and/or patent applications relating to the Licensed Technology and/or EPD filed by, issued or assigned to Licensor and/or its Subsidiaries anywhere in the world on or before the fifth anniversary date from the Effective Date as well as all divisionals, continuations, continuations-in-part, reissues and/or reexaminations filed in connection therewith. For the avoidance of doubt, Licensed Patents include without limitation the patents and patent applications attached hereto as Schedule A.

1.4    "Licensed Products" means Subject EPD Products and/or products which the Licensed Patents and/or Licensed Technology may be related to.

1.5    "Subject EPD Products" means electrophoretic displays comprising the technical features as set forth in Schedule B attached hereto.

1.6    "Subsidiaries" means any corporation, company, or other entity of which more than fifty percent (50%) of the outstanding shares or stock or ownership interest entitled to vote for the election of directors is owned or controlled by either party,

1

CONFIDENTIAL

directly or indirectly, during the term of this Agreement, but any such entity constitutes a Subsidiary only so long as such ownership or control exists.

## Article 2. Grant of Exclusive License and Release

In consideration of the royalties agreed to be paid by Licensee to Licensor hereunder and other considerations, the parties agree that:

2.1     Licensor hereby grants to Licensee and its Subsidiaries an exclusive, perpetual, worldwide license under any and all Licensed Technology to make, have made, sell, offer for sale, use, import, export, lease and/or otherwise dispose of the Licensed Products. Licensee on behalf of itself and its Subsidiaries hereby accepts such license. Licensor retains a non-exclusive right to use the Licensed Technology and Licensed Products in a non-competitive manner, consistent with this Agreement.

2.2     Licensor hereby grants to Licensee and its Subsidiaries an exclusive, worldwide license under any and all Licensed Patents to make, have made, sell, offer for sale, use, import, export, lease and/or otherwise dispose of the Licensed Products, and also sub-license the Licensed Patents, during the term of the Agreement. Licensee on behalf of itself and its Subsidiaries hereby accepts such license. Licensor retains a non-exclusive right to use the Licensed Patents and Licensed Products in a non-competitive manner, consistent with this Agreement.

2.3     Licensor hereby releases and discharges Licensee and its Subsidiaries from any and all actions, causes of action, claims or demands whatsoever, in law or equity of any kind, under the Licensed Patents and the Licensed Technology for any products made, have made, used, imported, exported, sold, offer for sale, leased and/or otherwise disposed of prior to Effective Date, if any.

## Article 3. Third Party Infringement

3.1     Licensee shall have the right at its discretion to commence, prosecute, compromise and settle any claim, action or proceeding for infringement (past or future), unfair competition, unauthorized use, misappropriation or violation of any of the Licensed Patents by any unlicensed third party within the territory where the Licensed Patents may be enforced ("Enforcement Proceeding"). Licensee may, at its discretion, commence, prosecute, compromise or settle any such claim, action or proceeding, as well as any claim, action or proceeding to defend any of the Licensed Patents. It is the intent and agreement of the Parties that this Agreement transfers to Licensee the full exclusive rights and all substantial rights

2

CONFIDENTIAL

in the Licensed Patents such that Licensee shall be able to bring an Enforcement Proceeding in its own name, and that no rights have been maintained by Licensor that would require Licensor to be a named party to any Enforcement Proceeding.

Article 4. Royalty Fees for Exclusive License

4.1     Licensee shall pay royalty fees to the Licensor as follows:

    (a)     Initial Fee: Licensee shall pay to Licensor an amount as set forth in Schedule C attached hereto.

    (b)     Conditional Fee: Licensee shall pay to Licensor an amount as set forth in Schedule D attached hereto upon fulfillment of the conditions as set forth in Schedule F attached hereto.

    (c)     Conditional Running Royalty: REDACTED REDACTED Licensee shall pay to Licensor a royalty for the sale of the Subject BPD Products by Licensee and/or its Subsidiaries as set forth in Schedule E attached hereto.

4.2     The foregoing specified payments shall be made in United States currency by wire transfer to the following account, pursuant to a bank transfer as follows:

    Bank/Branch Name: REDACTED
    Address:

    Swift Code:
    Account Name:
    Account Number:

4.3     All taxes imposed as a result of the existence or performance of this Agreement shall be borne and paid by the Party required to do so by applicable law; provided, however, that, if so required by applicable law, Licensee shall withhold the amount of any national taxes levied by the Government of the Republic of China (Taiwan), on any payment by the Licensee hereunder, shall promptly pay such amount to the appropriate tax authorities of the Government of the Republic of China (Taiwan) and shall transmit to the Licensor official tax receipts or other evidence issued by such tax authorities.

CONFIDENTIAL

Article 5. Term

5.1     This Agreement shall become effective as of the Effective Date and shall remain in full force and effect until the last to expire of the Licensed Patents.

Article 6. Miscellaneous

6.1     The rights and obligations of the Parties under this Agreement shall be governed by and construed in accordance with laws of California. Any dispute in connection with this Agreement shall be submitted to the arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules. The place of arbitration shall be San Francisco, California.

6.2     The terms and conditions of this Agreement may only be amended by a writing signed by the parties through their duly authorized representatives.

6.3     Except as otherwise specifically provided in this Agreement, neither this Agreement nor any rights hereunder nor any Licensed Patents may be assigned or otherwise transferred by any party, in whole or in part, whether voluntary or by operation of law, including by way of sale of assets, merger or consolidation, without the prior written consent of the other party, provided that Licensee may transferred its rights and obligations under this Agreement to a Subsidiary or affiliate without Licensor's consent. Any purported assignment without any such consent is void. In the event of any default in payments due Licensor under this agreement by said Subsidiaries or affiliates, Licensee shall be responsible for the payment of such amounts due Licensor. This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including the covenants granted herein.

6.4     Any notice required or permitted under this Agreement or required by law must be in writing and must be (i) delivered in person, (ii) sent by facsimile with a hard copy of such facsimile sent by (international or domestic) mail, or (iii) sent by overnight or next business day courier such as Federal Express, UPS or DHL, as follows:

        (1)     If to Licensor:

                CopyTele, Inc.
                900 Walt Whitman Road
                Melville, New York 11747

4

CONFIDENTIAL

Attn: Denis A. Krusos
Fax: 631-549-3813

(2)   If to Licensee:

AU Optronics Corp.
1 Li-Hsin Road 2
Hsinchu Science Park
Hsinchu, Taiwan
Attn: Legal Office
Fax: REDACTED

Either party may amend its address by written notice to the other party in
accordance with this Article. Notices will be deemed to have been given at the
time of actual delivery in person on a business day, five (5) business days (seven
(7) business days for international delivery) after deposit in the mail as set forth
herein, or one (1) business day after delivery to an overnight courier service
(4 business days for international delivery).

6.5   Except as expressly provided herein, the rights and remedies herein provided shall
be cumulative and not exclusive of any other rights or remedies provided by law
or otherwise. Failure by either party to detect, protest, or remedy any breach of
this Agreement shall not constitute a waiver or impairment of any such term or
condition, or the right of such party at any time to avail itself of such remedies as
it may have for any breach or breaches of such term or condition. A waiver may
only occur pursuant to the express written permission of an authorized officer of
the party against whom the waiver is asserted.

6.6   In the event that any term, condition or provision of this Agreement is declared or
found by a court of competent jurisdiction to be invalid, illegal, unenforceable or
void, the parties shall endeavor in good faith to agree to amendments that will
preserve, as far as possible, the intentions expressed in this Agreement. If the
parties fail to agree on such amendments, such invalid term, condition or
provision shall be severed from the remaining terms, conditions and provisions,
which shall continue to be valid and enforceable to the fullest extent permitted by
law.

6.7   This Agreement is the result of negotiations between Licensor and Licensee and
accordingly shall not be construed for or against a party merely because such
party drafted this Agreement or any portion thereof.

5

CONFIDENTIAL

6.8   Titles of the Articles herein are for the convenience of reference only and shall not affect the construction of this Agreement.

6.9   In the event of any legal action to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled, in addition to its court costs, to its reasonable attorneys' fees, including without limitation, the costs, expenses and attorneys' fees on any appeal.

6.10  This Agreement sets forth the entire agreement and understanding between the parties with respect to the subject matter described herein and supersedes and cancels all previous negotiations, agreements and commitments, whether oral or in writing, with respect to the subject matter described herein.

6.11  Licensor agrees to make any maintenance fees for the Licensed Patents in a timely manner as they are due. Licensor agrees to take further reasonable actions as may be requested by Licensee from time to time during the term of this Agreement to effectuate the terms and conditions of this Agreement.

6.12  Licensor and Licensee will discuss and conclude a joint development agreement for the Subject EPD Products as soon as practicable after the Effective Date hereof and will make their best efforts to jointly develop the Subject EPD Products [REDACTED]

6.13  Licensor and Licensee agree to abide by the confidential obligations as set forth in Schedule G attached hereto.

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties through their duly authorized representatives to be effective as of the Effective Date.

Licensor:                                          Licensee:

CopyTele Inc.                                      AU Optronics Corp.
                                                   REDACTED
By: _____                      By: _____

Name: Denis A. Krusos                              Name: 
Title: Chairman and                                Title: 
       Chief Executive Officer

6

CONFIDENTIAL

**SCHEDULE A**
**CONFIDENTIAL**

Non-Exhaustive List of Licensed Patents and Patent Applications

| Title | Serial No. | Filing Date | Patent No. | Patent Issue Date |
|-------|-----------|-------------|------------|-------------------|



CONFIDENTIAL

## SCHEDULE A
## CONFIDENTIAL

Non-Exhaustive List of Licensed Patents and Patent Applications

| Title | Serial No. | Filing Date | Patent No. | Patent Issue Date |
|-------|-----------|-------------|-----------|-------------------|



CONFIDENTIAL

## SCHEDULE A
## CONFIDENTIAL

Non-Exhaustive List of Licensed Patents and Patent Applications

| Title | Serial No. | Filing Date | Patent No. | Patent Issue Date |
|-------|-----------|-------------|------------|-------------------|



CONFIDENTIAL

## SCHEDULE A
### CONFIDENTIAL

Non-Exhaustive List of Licensed Patents and Patent Applications

| Title | Serial No. | Filing Date | Patent No. | Patent Issue Date |
|-------|-----------|-------------|------------|-------------------|



CONFIDENTIAL

## SCHEDULE A
## CONFIDENTIAL

Non-Exhaustive List of Licensed Patents and Patent Applications

| Title | Serial No. | Filing Date | Patent No. | Patent Issue Date |
|-------|------------|-------------|------------|-------------------|



11

CONFIDENTIAL

## SCHEDULE A
## CONFIDENTIAL

Non-Exhaustive List of Licensed Patents and Patent Applications

| Title | Serial No. | Filing Date | Patent No. | Patent Issue Date |
|-------|-----------|-------------|-----------|-------------------|

REDACTED

12

CONFIDENTIAL

## SCHEDULE A
## CONFIDENTIAL

Non-Exhaustive List of Licensed Patents and Patent Applications

| Title | Serial No. | Filing Date | Patent No. | Patent Issue Date |
|-------|-----------|-------------|-----------|-------------------|



13

CONFIDENTIAL

## SCHEDULE A
## CONFIDENTIAL

Non-Exhaustive List of Licensed Patents and Patent Applications

| Title | Serial No. | Filing Date | Patent No. | Patent Issue Date |
|-------|-----------|-------------|------------|-------------------|



CONFIDENTIAL

## SCHEDULE A
## CONFIDENTIAL

Non-Exhaustive List of Licensed Patents and Patent Applications

| Title | Serial No. | Filing Date | Patent No. | Patent Issue Date |
|---|---|---|---|---|



CONFIDENTIAL

## SCHEDULE A
## CONFIDENTIAL

Non-Exhaustive List of Licensed Patents and Patent Applications

| Title | Serial No. | Filing Date | Patent No. | Patent Issue Date |
|---|---|---|---|---|



16

CONFIDENTIAL

## SCHEDULE A
## CONFIDENTIAL

Non-Exhaustive List of Licensed Patents and Patent Applications

| Title | Serial No. | Filing Date | Patent No. | Patent Issue Date |
|-------|------------|-------------|------------|-------------------|



CONFIDENTIAL

**SCHEDULE A**
**CONFIDENTIAL**
Non-Exhaustive List of Licensed Patents and Patent Applications

REDACTED

| Title | PA No. | PA Filing Date | Patent No. | Patent Pub Date | Countries |
|-------|--------|----------------|------------|-----------------|-----------|

REDACTED

18

CONFIDENTIAL

**SCHEDULE A**
**CONFIDENTIAL**

Non-Exhaustive List of Licensed Patents and Patent Applications

REDACTED

| Title | PA No. | PA Filing Date | Patent No. | Patent Pub Date | Countries |
|-------|--------|----------------|------------|-----------------|-----------|



19

CONFIDENTIAL

SCHEDULE A
CONFIDENTIAL

Non-Exhaustive List of Licensed Patents and Patent Applications

**COPYTELE EPD PATENTS - EUROPE**

| Title | PA No. | PA Filing Date | Patent No. | Patent Pub Date | Countries |
|---|---|---|---|---|---|

REDACTED

20

CONFIDENTIAL



CONFIDENTIAL

**SCHEDULE A**
**CONFIDENTIAL**

Non-Exhaustive List of Licensed Patents and Patent Applications



| Title | PA No. | PA Filing Date | Patent No. | Patent Pub Date |
|-------|--------|----------------|------------|-----------------|

22

CONFIDENTIAL

**SCHEDULE A**
**CONFIDENTIAL**

Non-Exhaustive List of Licensed Patents and Patent Applications



23

CONFIDENTIAL

## SCHEDULE A
### CONFIDENTIAL

Non-Exhaustive List of Licensed Patents and Patent Applications

REDACTED



| Title | PA No. | PA Filing Date | Patent No. | Patent Pub Date |
|---|---|---|---|---|

24

CONFIDENTIAL

**SCHEDULE B**
**CONFIDENTIAL**

Definition of "Subject EPD Products"



CONFIDENTIAL

## SCHEDULE C
## CONFIDENTIAL

Amount of the Initial Fee

Licensee shall pay to Licensor an Initial Fee of REDACTED no later than thirty (30) days from the Effective Date.

26

CONFIDENTIAL

## SCHEDULE D
## CONFIDENTIAL

Amount of the Conditional Fee

Licensee shall pay to Licensor a Conditional Fee of REDACTED no later than REDACTED from Licensor's receipt of a written confirmation jointly signed by Licensor and Licensee, which confirmation cannot be unreasonably withheld by Licensee, that the conditions set forth in Schedule F have been fulfilled.

27

CONFIDENTIAL

## SCHEDULE E
## CONFIDENTIAL

### Amount of the Conditional Running Royalty

Licensor and Licensee shall discuss and agree on a reasonable running royalty for the sale of the Subject EPD Products by Licensee and/or its Subsidiaries that practice the Licensed Patents as issued on the basis of the following principles:



28

CONFIDENTIAL

**SCHEDULE F**
**CONFIDENTIAL**

Conditions for the Conditional Fee



CONFIDENTIAL

## SCHEDULE G
## CONFIDENTIAL

### Confidential Obligations

(1)    DEFINITION. The trade secrets and all information communicated by either of Licensor or Licensee (a "disclosing party") to the other (a "receiving party"), in oral, written or electronic form, which is confidential to the disclosing party and provides value to the disclosing party at least in part by virtue of its confidential status, and are marked with "Confidential" or similar legend (any information disclosed in oral shall be reduced into writing and marked with "Confidential" or similar legend within 60 days following the disclosure), shall be deemed Confidential Information pursuant to this Agreement. In addition, and without limitation, the terms and conditions of this Agreement shall be deemed Confidential Information.

(2)    MAINTENANCE OF CONFIDENTIALITY. Each party, as a receiving party, agrees to engage in efforts to maintain Confidential Information of the disclosing party in confidence at least as stringent as the efforts that the receiving party engages in to protect its own confidential information, and in any event no less than commercially reasonable efforts. Without limiting the foregoing, the receiving party shall restrict access to the Confidential Information of the disclosing party, by electronic security measures in the case of electronic files, and by physical security measures in the case of hard copies, to those employees who have a need to know such Confidential Information and shall advise those employees of the restrictions of this Agreement prior to any such disclosure. The receiving party's obligations under this Schedule G will be effective for a term of five years from the Effective Date.

(3)    EXCEPTIONS. As used in this Agreement, Confidential Information shall not include:

  (a) Information which is now available to the public or hereafter becomes available to the public without any violation of this Agreement;

  (b) Information disclosed in good faith to the receiving party by a third party legally entitled to disclose the same;

  (c) Information which is independently developed by the receiving party; and

  (c) Information is required to be disclosed to any government agency or any regulatory authority or a court of competent jurisdiction provided that the parties agree to use their best efforts to minimize the disclosure of such information or be subject to a protective order and shall consult with and assist the other party.

For the avoidance of doubt, Licensee and its Subsidiaries shall not be deemed in breach of this Agreement by virtue of making or selling any product which contains Confidential Information and/or Licensed Technology, whether or not such Confidential Information or Licensed Technology can be known by way of reverse engineering or otherwise.

CONFIDENTIAL

(4)    PUBLIC DISCLOSURES. Notwithstanding the foregoing, each receiving party shall be allowed to disclose Confidential Information of the disclosing party to make any necessary announcement or reporting required by the U.S. Securities and Exchange Commission, any stock exchange, the NASDAQ Stock Market, the New York Stock Exchange, and/or the Taiwan stock exchange. However, the party making the disclosure shall use reasonable efforts to notify and consult with the other party in advance of the contents of the announcement or the reporting.

Exhibit B

CONFIDENTIAL

## LICENSE AGREEMENT

This License Agreement ("Agreement"), dated and effective as of May 27th, 2011 ("Effective Date"), is made and entered into by and between CopyTele Inc., having its office at 900 Walt Whitman Road, Melville, New York 11747 ("Licensor"), on the one hand, and AU Optronics Corp. ("Licensee"), having its office at 1 Li-Hsin Road 2, Hsinchu Science Park, Hsinchu, Taiwan, on the other hand.

In consideration of the mutual covenants and obligations herein undertaken, Licensor and Licensee agree as follows:

Article 1. Definitions

In this Agreement, the following terms shall have the respective meanings set forth below:

1.1     "Licensed Technology" means know how, technical information, engineering data, specifications of materials and other information owned or controlled by Licensor and/or its Subsidiaries relating to nano display.

1.2     "Licensed Patents" means any and all patents and/or patent applications relating to the Licensed Technology and/or nano display filed by, issued or assigned to Licensor and/or its Subsidiaries anywhere in the world on or before the fifth anniversary date from the Effective Date as well as all divisionals, continuations, continuations-in-part, reissues and/or reexaminations filed in connection therewith. For the avoidance of doubt, Licensed Patents include without limitation the patents and patent applications attached hereto as Schedule A.

1.3     "Licensed Products" means Subject Nano Display Products and/or products which the Licensed Patents and/or Licensed Technology may be related to.

1.4     "Subject Nano Display Products" means field emission displays comprising the technical features as set forth in Schedule B attached hereto.

1.5     "Subsidiaries" means any corporation, company, or other entity of which more than fifty percent (50%) of the outstanding shares or stock or ownership interest entitled to vote for the election of directors is owned or controlled by either party, directly or indirectly, during the term of this Agreement, but any such entity constitutes a Subsidiary only so long as such ownership or control exists.

Article 2. Grant of License and Release

1

CONFIDENTIAL

In consideration of the royalties agreed to be paid by Licensee to Licensor hereunder and other considerations, the parties agree that:

2.1     Licensor hereby grants to Licensee and its Subsidiaries a non-exclusive, perpetual, worldwide license under any and all Licensed Technology to make, have made, sell, offer for sale, use, import, export, lease and/or otherwise dispose of the Licensed Products. Licensee on behalf of itself and its Subsidiaries hereby accepts such license.

2.2     Licensor hereby grants to Licensee and its Subsidiaries a non-exclusive, worldwide license under any and all Licensed Patents to make, have made, sell, offer for sale, use, import, export, lease and/or otherwise dispose of the Licensed Products during the term of this Agreement. Licensee on behalf of itself and its Subsidiaries hereby accepts such license.

2.3     Licensor hereby releases and discharges Licensee and its Subsidiaries from any and all actions, causes of action, claims or demands whatsoever, in law or equity of any kind, under the Licensed Patents and the Licensed Technology for any products made, have made, used, imported, exported, sold, offer for sale, leased and/or otherwise disposed of prior to Effective Date, if any.

Article 3. Royalty Fees for License

3.1     Licensee shall pay royalty fees to the Licensor as follows:

   (a)     Initial Fee: Licensee shall pay to Licensor an amount as set forth in Schedule C attached hereto.

   (b)     Conditional Fee: Licensee shall pay to Licensor an amount as set forth in Schedule D attached hereto upon fulfillment of the conditions as set forth in Schedule F and Schedule H, respectively, attached hereto.

   (c)     Conditional Running Royalty: REDACTED REDACTED , Licensee shall pay to Licensor a royalty for the sale of the Subject Nano Display Products by Licensee and/or its Subsidiaries as set forth in Schedule E attached hereto.

3.2     The foregoing specified payments shall be made in United States currency by wire transfer to the following account, pursuant to a bank transfer as follows:

Bank/Branch Name: 
Address:

2

CONFIDENTIAL



Swift Code:
Account Name:
Account Number:

3.3 All taxes imposed as a result of the existence or performance of this Agreement shall be borne and paid by the Party required to do so by applicable law; provided, however, that, if so required by applicable law, Licensee shall withhold the amount of any national taxes levied by the Government of the Republic of China (Taiwan), on any payment by the Licensee hereunder, shall promptly pay such amount to the appropriate tax authorities of the Government of the Republic of China (Taiwan) and shall transmit to the Licensor official tax receipts or other evidence issued by such tax authorities.

Article 4. Term

4.1 This Agreement shall become effective as of the Effective Date and shall remain in full force and effect until REDACTED

Article 5. Miscellaneous

5.1 The rights and obligations of the Parties under this Agreement shall be governed by and construed in accordance with laws of California. Any dispute in connection with this Agreement shall be submitted to the arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules. The place of arbitration shall be San Francisco, California.

5.2 The terms and conditions of this Agreement may only be amended by a writing signed by the parties through their duly authorized representatives.

5.3 Except as otherwise specifically provided in this Agreement, neither this Agreement nor any rights hereunder nor any Licensed Patents may be assigned or otherwise transferred by any party, in whole or in part, whether voluntary or by operation of law, including by way of sale of assets, merger or consolidation, without the prior written consent of the other party, provided that Licensee may transferred its rights and obligations under this Agreement to a Subsidiary or affiliate without Licensor's consent. Any purported assignment without any such consent is void. In the event of any default in payments due Licensor under this agreement by said Subsidiaries or affiliates, Licensee shall be responsible for the payment of such amounts due Licensor. This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including the covenants granted herein.

3

CONFIDENTIAL

5.4    Any notice required or permitted under this Agreement or required by law must be in writing and must be (i) delivered in person, (ii) sent by facsimile with a hard copy of such facsimile sent by (international or domestic) mail, or (iii) sent by overnight or next business day courier such as Federal Express, UPS or DHL, as follows:

(1)    If to Licensor:

CopyTele, Inc.
900 Walt Whitman Road
Melville, New York 11747
Attn: Denis A. Krusos
Fax: 631-549-3813

(2)    If to Licensee:

AU Optronics Corp.
1 Li-Hsin Road 2
Hsinchu Science Park
Hsinchu, Taiwan
Attn: Legal Office
Fax: REDACTED

Either party may amend its address by written notice to the other party in accordance with this Article. Notices will be deemed to have been given at the time of actual delivery in person on a business day, five (5) business days (seven (7) business days for international delivery) after deposit in the mail as set forth herein, or one (1) business day after delivery to an overnight courier service (4 business days for international delivery).

5.5    Except as expressly provided herein, the rights and remedies herein provided shall be cumulative and not exclusive of any other rights or remedies provided by law or otherwise. Failure by either party to detect, protest, or remedy any breach of this Agreement shall not constitute a waiver or impairment of any such term or condition, or the right of such party at any time to avail itself of such remedies as it may have for any breach or breaches of such term or condition. A waiver may only occur pursuant to the express written permission of an authorized officer of the party against whom the waiver is asserted.

5.6    In the event that any term, condition or provision of this Agreement is declared or found by a court of competent jurisdiction to be invalid, illegal, unenforceable or void, the parties shall endeavor in good faith to agree to amendments that will preserve, as far as possible, the intentions expressed in this Agreement. If the

4

CONFIDENTIAL

parties fail to agree on such amendments, such invalid term, condition or provision shall be severed from the remaining terms, conditions and provisions, which shall continue to be valid and enforceable to the fullest extent permitted by law.

5.7 This Agreement is the result of negotiations between Licensor and Licensee and accordingly shall not be construed for or against a party merely because such party drafted this Agreement or any portion thereof.

5.8 Titles of the Articles herein are for the convenience of reference only and shall not affect the construction of this Agreement.

5.9 In the event of any legal action to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled, in addition to its court costs, to its reasonable attorneys' fees, including without limitation, the costs, expenses and attorneys' fees on any appeal.

5.10 This Agreement sets forth the entire agreement and understanding between the parties with respect to the subject matter described herein and supersedes and cancels all previous negotiations, agreements and commitments, whether oral or in writing, with respect to the subject matter described herein.

5.11 Licensor agrees to make any maintenance fees for the Licensed Patents in a timely manner as they are due. Licensor agrees to take further reasonable actions as may be requested by Licensee from time to time during the term of this Agreement to effectuate the terms and conditions of this Agreement.

5.12 Licensor and Licensee will discuss and conclude a joint development agreement for the Subject Nano Display Products as soon as practicable after the Effective Date hereof and will make their best efforts to jointly develop the Subject Nano Display Products ▮REDACTED▮ REDACTED ▮

5.13 Licensor and Licensee agree that the granting of any additional license(s) under the Licensed Patents by Licensor to any third party will be subject to the written consent of the Licensor, the Licensee, and Videocon Industries Limited of India under such reasonable conditions to be discussed by the said three parties, subject to any necessary antitrust approval, if any.

5.14 Licensor and Licensee agree to abide by the confidential obligations as set forth in Schedule G attached hereto.

CONFIDENTIAL

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties through their duly authorized representatives to be effective as of the Effective Date.

Licensor:                                          Licensee:

CopyTele Inc.                                      AU Optronics Corp.

By: _Clen D. Kuun_                                 By: REDACTED
Name: Denis A. Krusos                              Name
Title: Chairman and                                Title:
       Chief Executive Officer

6

CONFIDENTIAL

**SCHEDULE A**
**CONFIDENTIAL**
Non-Exhaustive List of Licensed Patents and Patent Applications

| Title | Serial No. | Filing Date | Patent No. | Patent Issue Date |
|---|---|---|---|---|

REDACTED

CONFIDENTIAL

## SCHEDULE A
## CONFIDENTIAL

Non-Exhaustive List of Licensed Patents and Patent Applications

| **Title** | **Serial No.** | **Filing Date** | **Patent No.** | **Patent Issue Date** |
|---|---|---|---|---|



8

CONFIDENTIAL

## SCHEDULE A
## CONFIDENTIAL

Non-Exhaustive List of Licensed Patents and Patent Applications

| **Title** | **Serial No.** | **Filing Date** | **Patent No.** | **Patent Issue Date** |
| --- | --- | --- | --- | --- |

REDACTED

9

CONFIDENTIAL

## SCHEDULE B
## CONFIDENTIAL

Definition of "Subject Nano Display Products"



I

CONFIDENTIAL

## SCHEDULE C
## CONFIDENTIAL

### Amount of the Initial Fee

Licensee shall pay to Licensor an Initial Fee of US REDACTED no later than thirty (30) days from the Effective Date.

CONFIDENTIAL

## SCHEDULE D
## CONFIDENTIAL

### Amount of the Conditional Fee

Licensee shall pay to Licensor a Conditional Fee of [REDACTED] no later than [REDACTED] from Licensor's receipt of a written confirmation jointly signed by Licensor and Licensee, which confirmation cannot be unreasonably withheld by Licensee, that the conditions set forth in Schedule F have been fulfilled.

Licensee shall pay to Licensor a Conditional Fee of [REDACTED] no later than [REDACTED] from Licensor's receipt of a written confirmation jointly signed by Licensor and Licensee, which confirmation cannot be unreasonably withheld by Licensee, that the conditions set forth in Schedule H have been fulfilled.

12

CONFIDENTIAL.

## SCHEDULE E
## CONFIDENTIAL

Amount of the Conditional Running Royalty

Licensor and Licensee shall discuss and agree on a reasonable running royalty for the sale of the Subject Nano Display Products by Licensee and/or its Subsidiaries that practice the Licensed Patents as issued on the basis of the following principles:



13

CONFIDENTIAL

**SCHEDULE F**
**CONFIDENTIAL**

Conditions for the Conditional Fee



14

CONFIDENTIAL

## SCHEDULE G
## CONFIDENTIAL

### Confidential Obligations

(1)     DEFINITION. The trade secrets and all information communicated by either of Licensor or Licensee (a "disclosing party") to the other (a "receiving party"), in oral, written or electronic form, which is confidential to the disclosing party and provides value to the disclosing party at least in part by virtue of its confidential status, and are marked with "Confidential" or similar legend (any information disclosed in oral shall be reduced into writing and marked with "Confidential" or similar legend within 60 days following the disclosure), shall be deemed Confidential Information pursuant to this Agreement. In addition, and without limitation, the terms and conditions of this Agreement shall be deemed Confidential Information.

(2)     MAINTENANCE OF CONFIDENTIALITY. Each party, as a receiving party, agrees to engage in efforts to maintain Confidential Information of the disclosing party in confidence at least as stringent as the efforts that the receiving party engages in to protect its own confidential information, and in any event no less than commercially reasonable efforts. Without limiting the foregoing, the receiving party shall restrict access to the Confidential Information of the disclosing party, by electronic security measures in the case of electronic files, and by physical security measures in the case of hard copies, to those employees who have a need to know such Confidential Information and shall advise those employees of the restrictions of this Agreement prior to any such disclosure. The receiving party's obligations under this Schedule G will be effective for a term of five years from the Effective Date.

(3)     EXCEPTIONS. As used in this Agreement, Confidential Information shall not include:

   (a) Information which is now available to the public or hereafter becomes available to the public without any violation of this Agreement;

   (b) Information disclosed in good faith to the receiving party by a third party legally entitled to disclose the same;

   (c) Information which is independently developed by the receiving party; and

   (c) Information is required to be disclosed to any government agency or any regulatory authority or a court of competent jurisdiction provided that the parties agree to use their best efforts to minimize the disclosure of such information or be subject to a protective order and shall consult with and assist the other party.

For the avoidance of doubt, Licensee and its Subsidiaries shall not be deemed in breach of this Agreement by virtue of making or selling any product which contains Confidential Information and/or Licensed Technology, whether or not such Confidential Information or Licensed Technology can be known by way of reverse engineering or otherwise.

15

CONFIDENTIAL

(4)     PUBLIC DISCLOSURES. Notwithstanding the foregoing, each receiving party shall be allowed to disclose Confidential Information of the disclosing party to make any necessary announcement or reporting required by the U.S. Securities and Exchange Commission, any stock exchange, the NASDAQ Stock Market, the New York Stock Exchange, and/or the Taiwan stock exchange. However, the party making the disclosure shall use reasonable efforts to notify and consult with the other party in advance of the contents of the announcement or the reporting.

16

CONFIDENTIAL

**SCHEDULE H**
**CONFIDENTIAL**



Exhibit C



**Robert A. Berman**
**President and CEO**
P: 631-533-2840
F: 631-549-5974
rberman@CopyTele.com

January 28, 2013

VIA Fax 886-3-563-2871 and Mail

AU Optronics Corp.
1 Li-Hsn Road 2
Hsinchu, Taiwan
Attn: Paul Lee, Sr. Legal Counsel

Dear Mr. Lee:

As you are aware, on October 5, 2012, CopyTele notified AUO Optronics Corp. ("AUO") of AUO's continuing material breaches of the Exclusive License Agreement dated May 27, 2011 (the "EPD Agreement"), and the License Agreement dated May 27, 2011 (the "Nano Agreement"), and CopyTele's intent to terminate the EPD Agreement and the Nano Agreement.

Since the October 5 notice, AUO has declined numerous requests to meet with CopyTele to discuss the pendency of EPD Agreement and the Nano Agreement, including the amicable resolution of all issues in dispute, and the potential cure of AUO's breaches of the agreements.

As a result of AUO's unwillingness to meet with CopyTele, and the continued material breaches of the EPD Agreement and the Nano Agreement by AUO, effective immediately, CopyTele hereby terminates the EPD Agreement and the Nano Agreement, in their entireties, including without limitation any and all rights, licenses, and sublicensing rights to the Licensed Technology and the Licensed Patents, as defined in the respective agreements. Additionally and in the alternative, CopyTele hereby demands the rescission of the EPD Agreement and the Nano Agreement. CopyTele offers to restore the consideration that CopyTele has received under those Agreements as set off against CopyTele's damages incurred as a result of AUO's conduct.

Thank you.

Sincerely,

Robert A. Berman